UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

---

**NEILAND COHEN**,

        Plaintiff,

  -vs-

**UNITED STATES OF AMERICA**,

        Defendant.

C.A. No. 1:07-MC-14-RMU
(C.A. No. 1:07-51)

---

**PLAINTIFF'S BRIEF IN OPPOSITION TO
DEFENDANT'S MOTION FOR PROTECTIVE ORDER**

---

Defendant United States seeks to block a Rule 30(b)(6) deposition sought by plaintiff Neiland Cohen until the Court has ruled on "various pretrial motions raising threshold issues of subject matter jurisdiction." (Motion, p. 1)[1] Because further deferral of meaningful discovery in a case that is now thirteen months old would threaten unduly to delay ultimate disposition of the case, Mr. Cohen opposes the piecemeal litigation approach implicit in the government's motion. He submits this brief in support of his position.

---

[1] The referenced "threshold issues" arise from the government's sharply contested contention that Mr. Cohen failed to comply with statutory prerequisites for filing his refund suit. Framing that objection in terms of subject matter jurisdiction is inexact; the issue is actually one of (alleged) failure to state a claim. *See Frey v. EPA*, 270 F.3d 1129, 1132 (7th Cir. 2001).

# ARGUMENT

I. **THE ISSUE OF WHY THE GOVERNMENT REVERSED ITS POSITION ON THE LONG DISTANCE TELEPHONE EXCISE TAX CONTROVERSY IS NOT GOING TO GO AWAY, REGARDLESS OF HOW THE PENDING MOTIONS ARE RESOLVED.**

The government bases its entire argument on the proposition that sovereign immunity precludes award of attorney's fees against the government without its consent. That is both unarguably correct and perfectly irrelevant. Insofar as the common fund theory is concerned, plaintiff is neither seeking an attorney's fees award "against" the United States nor proceeding in this Court without the government's consent.

The attorney's fees plaintiff seeks under his common fund theory would not be awarded against the United States but against the beneficiaries of that fund, out of money that the government has already admitted it must pay them. The government is involved merely as a holder of money that it owes to someone else.

The government correctly points out that sovereign immunity is nevertheless implicated because the money (whomever it belongs to) would be drawn from the Treasury. *See Dugan v. Rank*, 372 U.S. 609, 620 (1963). Sovereign immunity, however, simply means that the government does not have to come into court at all unless it has agreed to. The government undeniably *has* consented to suit in cases that involve controversies over tax refunds, *see* 28 U.S.C. § 1346(a)(1), or challenges to administrative action other than requests for money damages. *See* 5 U.S.C. § 702. The case at bar involves both; and the premise for plaintiff's pursuit of a common fund attorney's fee award against the beneficiaries is, precisely, that by pursuing those claims he has materially contributed to the creation of that fund (or, in the case of the APA claim, to its possible future enhancement). Plaintiff's common fund theory is simply one adjudicatory element in litigation to which the government has in fact consented.

MILW_2166924.1

Even if the government's "jurisdictional" motion were granted, then, the question raised by the government's sovereign immunity objection to plaintiff's common fund claim would be a very narrow one: Where the United States *has* consented to be sued in connection with a particular class of controversies, does a court dealing with such a case need further specific consent to particular remedies that involve money held by the government but belonging to someone else?

The United States Supreme Court answered that question in its seminal decision in *FHA v. Burr*, 309 U.S. 242 (1940). The issue in that case was whether wages owed by the Federal Housing Administration to two employees could be garnisheed by a judgment creditor of those employees. *Id.* at 242-43. The FHA claimed sovereign immunity as a defense, contending that, as an agency of the United States, it was not subject to suit except in connection with its own statutory duties and liabilities. *Id*. at 244, 247.

The Court rejected that contention, pointing out that the applicable legislation had been amended to include authorization for the FHA administrator "to sue and be sued in any court of competent jurisdiction." *Id*. at 244. The Court explained that, "Since consent to 'sue or be sued' has been given by Congress, the problem here merely involves a determination of whether or not garnishment comes within the scope of that authorization." *Id*. Insisting that congressional waivers of governmental immunity "should be liberally construed", the Court said that in the absence of express exclusion no "civil process incident to the commencement or continuance of legal proceedings" was precluded. *Id*. at 245.[2]

---

[2] The Court carefully distinguished a nineteenth century wage attachment case, *Buchanan v. Alexander*, 45 U.S. (4 How.) 20 (1846), by noting that "no consent whatsoever to 'sue or be sued'" in any capacity had been given in that case. *Burr*, 309 U.S. at 244. The government does not cite *Buchanan* here, tacitly recognizing its inapplicability.

*Cobell v. Norton*, 240 F.3d 1081 (D.C. Cir. 2001), provides a more recent example of the application of this principle. The plaintiffs in that case challenged the Interior Department's handling of Native American funds held in so-called IIM ("Individual Indian Money") accounts. The court rejected Interior's sovereign immunity objection, holding that sovereign immunity had been waived by § 702 of the Administrative Procedure Act. *Cobell*, 240 F.3d at 1094-95. As the court then explained, "That plaintiffs rely upon common law trust principles in pursuit of their claim is immaterial, as here they seek specific relief other than money damages and federal courts have jurisdiction to hear such claims under the APA." *Id.*

Once the government is in court by its own consent, in other words, it is subject to the full array of judicial remedies with respect to third-party assets that it holds except to the extent (if any) that Congress has expressly precluded some of those remedies.[3] Just as the government was subject in *Burr* to a judicial remedy (*i.e.,* garnishment) protecting the rights of one party in money the government owed to another, so it is here; and just as remedies based on the common law of trusts were available to the plaintiffs in *Cobell* based on the APA's waiver of sovereign immunity, so a remedy drawn from the common fund doctrine is available to plaintiff here on precisely the same basis. The same principle that required the FHA to pay a judgment creditor $ 71.11 owed as wages to a judgment debtor can require the Treasury here to pay Mr. Cohen whatever the Court finds he is due from the billions that the Treasury owes as refunds to the common fund beneficiaries. No more in one case than the other does the mere fact that the money is in the government's hands make the award one "against" the government; nor make

---

[3] The government makes no effort to square its insistence that exceptions to sovereign immunity should be strictly construed with *Burr*'s admonition that, where Congress *has* waived sovereign immunity, that waiver "should be liberally construed." *Burr*, 309 U.S. at 244.

4

any consent other than the government's general consent to be sued in connection with a particular class of controversies necessary to overcome a sovereign immunity objection.

The government does not discuss *Burr* or *Cobell*. In its brief opposing plaintiff's preliminary injunction motion, however, the government relies heavily on *Consolidated Edison Company v. Bodman*, 445 F.3d 438 (D.C. Cir. 2006). That reliance is misplaced.

In addressing claims for attorney's fees under the common fund doctrine against both the government itself and private parties to whom the government owed money, the *Con Ed* court recognized that sovereign immunity was no obstacle to a post-distribution award against the fund beneficiaries. *Con Ed*, 445 F.3d at 448-49. The court said that an order awarding fees before distribution – that is, while the money was still in the government's hands – "would pose the same sovereign immunity issues," whether the order was directed at the beneficiaries or the government itself. *Id.* at 448.

The government treats that as the end of *Con Ed*'s inquiry on the issue, but in fact it was the beginning. As the court took pains to explain, the fee-seekers in *Con Ed* had sued under § 210 of the Economic Stabilization Act ("ESA"). *Id.* at 449. That provision not only does not authorize claims against the government, it implicitly excludes them. (This is explained in detail in earlier iterations of the *Con Ed* litigation. *See Consolidated Edison Company v. Richardson*, 233 F.3d 1376, 1380 (Fed. Cir. 2000), and *Consolidated Edison Company v. Abraham*, 271 F. Supp. 2d 104, 108-109 (D.D.C. 2003), *aff'd*, 87 Fed. Appx. 751 (Fed. Cir. 2004).) The fee-seekers tried at the appellate level to invoke a different provision, § 209, but the court pointed out that it was irrelevant. *Con Ed*, 445 F.3d at 449. The court expressly declined to reach the question of whether § 209's waiver would permit a pre-distribution common fund

5

attorney's fees award against the beneficiaries if the fee-seekers had brought their underlying claim under that provision. *Id.* at 449-50.

*Con Ed*, in short, is the converse of the case at bar. In both cases, sovereign immunity is implicated because the money in question is in the government's hands. *Con Ed* held that this precluded a pre-distribution attorney's fees award against the beneficiaries because the fee-seekers were suing under a statute that did *not* waive it. Plaintiff here is suing under statutes that do. That is why this case is governed by *Burr* while *Con Ed* was not.

*Dugan*, along with many other cases, recognizes that money in the Treasury is the government's money until it has been paid out, even if it is owed to someone else. If the government has consented to suit in connection with a given type of controversy, however, and has been sued in that connection, the teaching of *Burr* and *Cobell* is that those funds are subject to common law remedies available in such litigation.

Accepting the government's position on subject matter jurisdiction would thus not have the slightest impact on the availability of the common fund remedy. Acceptance of that position would mean that plaintiff individually and/or the class he seeks to represent would not be entitled to a refund. The government does not deny, however, that common fund attorney's fees can be awarded even to a litigant whose own claim fails – indeed, even to one whose claim is dismissed for lack of jurisdiction (*see Kopet v. Esquire Realty Co.*, 523 F.2d 1005, 1008-1009 (2d Cir. 1975) (fee award permissible for state law claims that were dismissed for lack of pendent jurisdiction)) – as long as pursuit of the claim played a material role in producing the fund. That issue – the very issue into which the government seeks to block inquiry – would therefore still be an integral part of this case even if the government's jurisdictional position

6

were accepted *in toto*. There is no reason to delay discovery pending rulings that will not make it unnecessary regardless of which way they go.

## II. THE SPECULATIVE POSSIBILITY OF OBJECTIONS BASED ON THE DELIBERATIVE PROCESS AND ATTORNEY-CLIENT PRIVILEGES DOES NOT WARRANT FORECLOSURE OF DISCOVERY.

The government says that asking it why it reversed its position on the long-distance telephone excise tax issue between late October, 2005 and late May, 2006 would potentially implicate the deliberative process privilege and perhaps the attorney-client privilege as well. The possibility that particular questions during a deposition *might* raise privilege issues, however, is hardly a reason to block the deposition altogether. *See United States v. IBM*, 453 F. Supp. 194, 195 (S.D.N.Y. 1977) (motion for protective order against repetitious questions at noticed depositions denied as premature where "the apprehension of abuse from which defendant seeks protection is merely speculative"); and *In re Penn Central Securities Litigation*, 347 F. Supp. 1347, 1348 (E.D. Pa. 1972) (motion for protective order by defendant subject to pending criminal charges in another case denied as premature where proper questions outside the Fifth Amendment privilege were possible, and where objections to improper questions could be raised during the deposition). Such an approach might be appropriate where one party seeks to depose a witness whose only possible relevant knowledge is privileged – the opposing party's trial counsel, for example. But the government here does not and could not credibly contend that *any* inquiry into the reasons for its flip-flop would necessarily be privileged.

If anything, in fact, the law suggests that inquiry of that kind would necessarily *not* be privileged. It is black-letter law that "the government's deliberative process privilege does not apply when a cause of action is directed at the government's intent." *In re Subpoena Duces Tecum Served on Office of Comptroller of Currency*, 156 F.3d 1279 (D.C. Cir. 1998). As

7

the same court explained in a prior, related controversy involving the same party, "If the plaintiff's cause of action is directed at the government's intent, however, it makes no sense to permit the government to use the [deliberative process] privilege as a shield." *In re Subpoena Duces Tecum Served on Office of Comptroller of Currency*, 145 F.3d 1422, 1424 (D.C. Cir. 1998).

To the extent (if any) that motive can be distinguished from intent, the reasoning is exactly the same. Unless the government chooses to concede that Mr. Cohen's lawsuit played a role in convincing it to retreat from the last-ditch, bitter-end litigation strategy announced in October, 2005, it will have to take a position on that issue at some point in this litigation. It would be anomalous indeed if the government were allowed to present its claimed motivation to the Court but then insist that the Court and Mr. Cohen simply take the government's word for it, without inquiry into the credibility of its contention.

In its first modern recognition of the deliberative process privilege, in fact, the Supreme Court made it clear that explanations for an agency's decisions do not fall within it. The issue in *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132 (1975), was whether "Advice and Appeals Memoranda which explain decisions by the [NLRB] General Counsel not to file a complaint" were subject to production under the Freedom of Information Act. *Id.* at 148. The Court held that the applicable standard was whether those documents would be treated as "normally privileged in the civil discovery context", and therefore analyzed the issue under the deliberative process privilege. *Id.* at 149.

The Court held that the privilege did not protect the memoranda, and that they were therefore subject to production. *Id.* at 148. The Court noted the uniformly recognized distinction "between predecisional communications, which are privileged [citing cases], and

communications made after the decision and designed to explain it, which are not." *Id*. at 151-52 (notes and citations omitted). The Court explained that:

> This distinction is supported not only by the lesser injury to the decisionmaking [sic] process flowing from disclosure of post-decisional [sic] communications, but also, in the case of those communications which explain the decision, by the increased public interest in knowing the basis for agency policy already adopted. . . . [T]he public is vitally concerned with the reasons which did supply the basis for an agency policy actually adopted.

*Id*. at 152. For more recent decisions recognizing the distinction between pre-decision recommendations and analyses, on the one hand, and post-decision explanations of agency policy determinations, on the other, *see Department of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001), and *United States v. Farley*, 11 F.3d 1385, 1389 (7th Cir. 1993).

Plaintiff in the case at bar is not interested in a blow-by-blow account of the debate within the Treasury over *whether* to reverse the policy articulated in October, 2005, or in the give-and-take among policymakers and their staffs on that question. The pros and cons of reversing the policy are irrelevant. The relevant fact is that the policy *was* reversed, and what plaintiff wants to know is why: what factors ultimately convinced the responsible officials to do an about-face on an issue affecting more than $ 10 billion? This is not only a question that plaintiff has a right to ask; it is a question in which, as the *National Labor Relations Board* Court said, the public itself is vitally concerned.

The analysis with respect to the objections the government thinks it might make on attorney-client and work-product grounds is similar. Plaintiff does not plan to ask whether the government's lawyers told it that it was likely to lose the pending cases (including plaintiff's), or whether the Solicitor General refused to support applications for Supreme Court

9

review of the appellate decisions that had repeatedly rejected the government's position. The question of whether the government in fact recognized the risk of adverse outcomes and was concerned about the strategic ramifications of such outcomes, without inquiry into the source of that recognition, would not implicate either the privilege or the immunity.

The question here is not whether any questions in the proposed deposition might trench on privileged areas. That is possible in almost any deposition. The question, rather, is the converse: Is it possible for any non-privileged answers to be elicited by questions within the scope of the notice? The answer is clearly affirmative. The appropriate way to protect any legitimate privilege concerns is therefore not to bar the deposition altogether but to allow it to proceed and to deal with issues of privilege if, as, and when they arise.

### III. THE GOVERNMENT HAS PUT THE SIZE AND COMPOSITION OF THE PUTATIVE CLASS IN ISSUE IN ITS BRIEF OPPOSING CLASS CERTIFICATION, AND IS THEREFORE IN NO POSITION TO BLOCK DISCOVERY INTO THOSE VERY ISSUES.

One of the grounds on which the government has opposed class certification is that plaintiff cannot show that the individual taxpayers who have applied for refunds represent a large enough group to warrant class treatment. It is far too late now for the government to decide that providing information directly relevant to an issue it has chosen to inject into the case is too much trouble.

The information sought is concededly within the government's knowledge. The Federal Rules of Civil Procedure provide ample tools to avoid undue imposition upon a party responding to a Rule 30(b)(6) deposition notice. The government's hint that it might have to parade a bevy of present and former senior officials into the deposition room is fanciful.

Plaintiff's class certification motion is indeed fully submitted and pending. It has not, however, been decided, and until it has been supplementation of the record relating to it is,

with the Court's permission, possible. Amendment of the motion, or (depending on the grounds for denial) renewal of that motion even if it is denied are likewise possible. If the motion is granted, finally, the information plaintiff seeks could play a substantial role in shaping class relief.

Plaintiff seeks straightforward discovery of clearly relevant and potentially crucial information. The government does not deny that plaintiff raises serious and legitimate issues that merit judicial attention. Ordinary discovery is part and parcel of that process. It should not be foreclosed.

## CONCLUSION

For the reasons outlined in this brief, plaintiff respectfully asks that defendant's motion for a protective order be denied.

Dated this 11th day of January, 2007.

>s/ Michael A. Bowen
>Attorney Bar Number: 1016965
>Zhu (Julie) Lee
>Attorney Bar Number: 1032454
>Isaac J. Morris
>Attorney Bar Number: 1053535
>FOLEY & LARDNER LLP
>777 East Wisconsin Avenue
>Milwaukee WI 53202-5306
>Telephone: (414) 271-2400
>
>Michael D. Leffel
>Attorney Bar Number: 1032238
>FOLEY & LARDNER LLP
>150 East Gilman Street
>Madison WI 53703-1481
>(608) 258-4258
>
>**Attorneys for Plaintiff**
>
>Direct Inquiries to:
>Michael A. Bowen

MILW_2166924.1

          Telephone:  (414) 297-5538
          Facsimile:  (414) 297-4900
          E-mail:  mbowen@foley.com

MILW_2166924.1